J-A01004-23
J-A01005-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| BRUCE A. RUBIN | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| PAUL A.R. STEWART HELM LEGAL SERVICES, LLC AND ALISHA ALEJANDRO | : | No. 2554 EDA 2021 |
| | : | |
| APPEAL OF: PAUL A.R. STEWART AND HELM LEGAL SERVICES, LLC | : | |

Appeal from the Judgment Entered November 22, 2021
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  181002397

| | | |
|---|---|---|
| BRUCE A. RUBIN | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| STEWART, PAUL A.R. STEWART HELM LEGAL SERVICES, LLC AND ALISHA ALEJANDRO | : | No. 2555 EDA 2021 |
| | : | |
| APPEAL OF: ALISHA ALEJANDRO | : | |

Appeal from the Judgment Entered November 22, 2021
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  181002397

BEFORE:  LAZARUS, J., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                    **FILED FEBRUARY 15, 2023**

In these related appeals,[1] Paul A.R. Stewart (Stewart), Helm Legal Services, LLC (HLS), and Alisha Alejandro (Alejandro) appeal from the judgment entered November 22, 2021,[2] in the Philadelphia County Court of Common Pleas, in favor of Bruce Rubin (Rubin) in this action for wrongful use of civil proceedings.[3] On appeal, at Docket 2554 EDA 2021, Stewart[4] requests judgment notwithstanding the verdict (JNOV) and a remittitur, argues the trial court erred with respect to five evidentiary rulings, and insists a punitive damages award against an attorney is improper and unconstitutional. At

_____

[1] These appeals were filed by co-defendants following a joint trial, and involve the same lengthy factual and procedural history. Furthermore, the trial court filed one opinion, denying both post-trial motions. Thus, we will dispose of these appeals in one decision.

[2] Both the notice of appeal filed by Stewart and HLS and the notice of appeal filed by Alejandro purport to appeal from the November 22, 2021, order denying their respective motions for post-trial relief. **See** Stewart/HLS's Notice of Appeal, 12/8/21; Alejandro's Notice of Appeal, 12/8/21. It is well-established that "an appeal 'does not properly lie from an order denying post-trial motions, but rather upon judgment entered following disposition of post-trial motions[.]" **Nazarak v. Waite**, 216 A.3d 1093, 1098 n.1 (Pa. Super. 2019). Because the trial court entered judgment on the verdict in the same order, we have changed the captions to reflect the appeals are from the entry of judgment. **See** Order, 11/22/21.

[3] **See** 42 Pa.C.S. § 8351.

[4] Prior to charging the jury in the underlying trial, the trial court determined that "a return of a verdict as it relates to Stewart would also by operation of law include [HLS]." N.T., 7/19/21, at 167. Although HLS is a separate entity and has appealed from the verdict, the underlying claims concern only Stewart's actions as the attorney for his co-defendant, the underlying plaintiff (Alejandro). Thus, for ease of discussion, we refer to the appeal at 2554 EDA 2021 as Stewart's appeal.

Docket 2555 EDA 2021, Alejandro argues Rubin failed to prove her liability for wrongful use of civil proceedings, and the trial court erred when it disqualified her counsel — Stewart — without notice or a hearing, when she waived any conflict of interest. For the reasons below, we affirm.

## I. FACTS & PROCEDURAL HISTORY – UNDERLYING ACTION

The facts in the prior lawsuit, which precipitated the present action for wrongful use of civil proceedings, are summarized by the trial court as follows:

> Plaintiff in the underlying action, [Alejandro] visited Barco Optical, Inc. doing business as Philadelphia Vision Center[1] ("Barco") on December 8, 2016. Barco is a provider of optometric services and sells eyeglass wear. On the above referenced date, Alejandro received optometric services from the optometrist performing eye exams at Barco, a corporate entity owned and operated by [Rubin, the] defendant in the underlying action.
>
> _____
>
> [1] Neither Barco Optical nor Philadelphia Vision Center are named parties in this action.
>
> _____
>
> Rubin is an optician;[5] he is neither an optometrist nor a Doctor of Optometry. There is no testimony that he performed an eye exam on Alejandro.
>
> The optometrist issued a prescription for corrective lenses. There is no testimony as to the communication between Alejandro and the optometrist. The optometric services were billed to Alejandro's insurance company.

_____

[5] Rubin explained that "[a]n optician is one that fills prescriptions that are written by eye doctors for eye glasses." N.T., 7/15/21, at 115. An optician does not have any medical training. ***Id.***

- 3 -

After receiving optometric services, Alejandro was asked if she wanted to purchase glasses from Barco. Alejandro assented and used the prescription to place an order for glasses, frame fitted with corrective lenses, with Barco. Alejandro also requested an anti-reflective coating for the lenses.

Alejandro did not allege, and there was no evidence presented, of any misrepresentations by Rubin or Barco when the order was placed. There was no evidence as to how the prescription was transferred to Barco. Additionally, there was no evidence that the cost of the frames and lenses were billed to an insurance company. In fact, it was Alejandro who was expected to pay for the glasses.

An invoice was created, with the prescription, to record the order. The total cost for the glasses was $399.00. No deposit was requested; and [none was] given. Alejandro was informed that the glasses would be ready for pick-up in "about a week." Based upon the above events and expressed understanding of the parties, the frames were sent to a laboratory where the prescribed lenses were customized and inserted into the frames.

Subsequently, Alejandro was notified that the glasses had been prepared and were ready for pick-up. Alejandro refused delivery and requested a copy of the written prescription. A Barco employee informed Alejandro that she needed to pay for the glasses before she could receive a copy of the written prescription. Alejandro refused and continued to request a copy of the written prescription on numerous other occasions.

Prior to January 17, 2017, Alejandro contacted [HLS] and spoke with [Stewart] about not receiving a written prescription for corrective lenses from Barco. Alejandro testified that she only wanted her eyeglass prescription.

On January 17, 2017, Stewart contacted Barco and spoke with [Rubin.[6]] Alejandro arrived an hour after Stewart's

---

[6] Rubin testified that, during this telephone call, Stewart threatened to "tie [him] up in legal proceedings and cost [him] a lot of money" if he did not give Alejandro a copy of her prescription. N.T., 7/15/21, at 128. He claimed Stewart told him "he would make [Rubin] miserable and that he is very tenacious." *Id.* Rubin also testified that, because he was "very taken back by [Stewart's] comments and threats[,]" he "freaked out, had a little outburst[,]" and "insulted" Stewart. *Id.* at 128, 135.

conversation. At that time, [Rubin] handed to Alejandro a copy of the written prescription. No money was exchanged, [and] no further demands made. Alejandro then used the prescription to purchase glasses from another entity.

Alejandro communicated to Stewart that she had received a copy of her prescription from [Rubin]. Based upon Alejandro's understanding, the matter was resolved. There was no evidence of further communications between Rubin and Alejandro.

Ten days after Alejandro's receipt of the prescription, on January 27, 2017, Stewart emailed a Notice of Claim for Negligence and Unfair Trade Practices to [Rubin] for failure to comply with the "Optometric Practice and Licensure Act, State Board of Optometry" and the Federal Ophthalmic Practice Rules. Specifically, Stewart claimed that the above referenced law required Rubin, who is neither an optometrist [nor] doctor of ophthalmology, to provide Alejandro with a copy of her written prescription for corrective lenses after her exam. The Notice of Claim requested the preservation of documents from December 8, 2016 (exam date) to January 18, 2017 (one day after [Rubin] handed the prescription to Alejandro).

In response to the Notice of Claim, [Rubin] emailed Stewart writing that, "I believe you are baseless in your claim . . . ." Stewart then advised [Rubin] that he had "15 days to settle this matter or my office will proceed to file a writ of summons and commence discovery."

Less than a month later, on February 21, 2017, Stewart and HLS submitted a demand to [Rubin] of $25,000. Alejandro was without knowledge of the demand. As preamble to the demand, Stewart claim[ed] to have "found numerous other clients" making the same or similar allegations. Stewart did not advise that he was representing the "other clients". As to other individuals not represented by Stewart or HLS, Stewart concluded that Rubin violated HIPAA "by [posting] medical patient information on social media websites[.]"

On February 28, 2017, the underlying matter, *Alisha Alejandro v. Philadelphia Vision Center, Bruce Rubin*, February Term 2017, No. 7325, was commenced by writ of summons.

Pre-complaint discovery was initiated. Stewart subsequently testified at trial [in the present action] that his

reasoning for seeking pre-complaint discovery was to narrow the issue and correctly identify the defendants in the underlying action. As part of his research, Stewart identified 20 or 21 entities utilizing some variation of "Philadelphia Vision Center". Upon review of the discovery provided, it was revealed that three (3) of the entities sued were fictitious names; the remaining were corporations with "Philadelphia Vision Center" as part of their names. There is no evidence that Stewart delved further into the individual records to determine if the named entities were related to one, or more, individuals and/or other entities. The discovery requests, however, included requests for admissions as well as the production of documentation of professional liability and/or malpractice insurance coverage. There were no discovery requests to determine the size and scope of Philadelphia Vision Center, [Rubin's] business.

On June 17, 2017, Stewart and HLS submitted a second settlement demand of "seven to ten thousand dollars." This sum was based upon the amount of "work and energy" that Stewart put into the case and would "likely . . . occur in the next week or so." The demand amount did not include any monies to Alejandro for her alleged injuries.

On July 5, 2017, the first of four (4) complaints [was] filed wherein Alejandro alleged that, as of January 27, 2017, she had not received a copy of her prescription. Each iteration of the Complaint alleged that Rubin "refused to provide to [her] a prescription, still demanding that she pay for eye frames, although at a reduced rate."[7]

On March 28, 2018, the deposition of [Rubin] was conducted. At that deposition, it was disclosed that [Rubin] owned only one store, but shared the fictitious name with other entities.

_____

[7] The original complaint, filed on July 5, 2017, named Rubin, Philadelphia Vision Center, and Louisa Gaiter Johnson, O.D., as defendants. *See* Alejandro's Complaint, 7/5/17, at ¶¶ 2-4. It asserted six counts, including a violation of the UTPCPL, civil conspiracy, three violations of the Sherman Act, 15 U.S.C. §§ 1-2, and a violation of the Clayton Act, 15 U.S.C. §§ 14- 16. *See id.* at ¶¶ 71-109. The first amended complaint, filed on November 7, 2017, included additional facts and asserted only one violation of the Sherman Act. The second amended complaint, filed a year later on November 16, 2018, omitted Dr. Gaiter Johnson as a defendant, but alleged the same counts.

Even with the knowledge that the alleged activities involved only one entity, [Stewart] continued to include allegations of antitrust violations in amended complaints.

At that same deposition, Stewart and HLS learned of a billing discrepancy, unrelated to the allegations contained in the Alejandro complaints. [Sometime after the deposition, Rubin offered Alejandro $5,000 to end the litigation. *See* N.T., 7/15/21, at 159-60. However, Stewart and Alejandro rejected the offer, and] on April 5, 2018, . . . submitted a third demand of $159,000 to settle the matter: $59,000 for "combination of damages and attorney fees" and $100,000 related to potential violations of "some sort of insurance billing fraud or something like that." Alejandro did not authorize or approve this demand. A third amended complaint failed to include any allegations regarding [Rubin's] billing process.[8]

The basis of the settlement demand is unclear. [Rubin] self-reported the billing error to the insurance company on April 11, 2018 and was never charged in this regard.

The matter was removed to federal court on May 22, 2018. On July 17, 2018, [Stewart and HLS] submitted a fourth demand of $20,000. By August 2, 2018, the final demand was reduced to $1,500 allowing for a court determined legal fee.

On August 9, 2018, Rubin filed a motion for summary judgment that was granted. Though uncontested, the Honorable Harvey Bartle III issued a memorandum explaining the court's reasoning. The court ruled against . . . Alejandro in the underlying case, having found that "Alejandro's claims fail for many reasons. Suffice it to say that [Rubin is] not liable for any underlying violation of the [Pennsylvania Unfair Trade Practice and Consumer Protection Law (UTPCPL), 73 P.S. §§ 201-1-201.10]."

In his memorandum, Judge Bartle wrote that in relation to the eye exam and prescription completed by a licensed optometrist, "It is well-settled that the UTPCPL does not apply to providers of medical services." As to retail services for

---

[8] The third amended complaint, filed on May 2, 2018, included a new defendant, Beth Lisa Brooks, O.D., but alleged the same counts.

prescription glasses, [Alejandro] failed to include any facts in the complaint to support an allegation of unfair trade.

Judge Bartle wrote, "The record does not contain any evidence that the conduct of [Rubin] related to the potential sale of the eyeglasses falls under unfair methods of competition or unfair or deceptive acts of practice as described in 73 [Pa.S. § 201-2(4)]." [Alejandro's] state claims were dismissed with prejudice. Thereafter the parties entered a stipulation to dismiss the remaining federal claims with prejudice.

Trial Ct. Op., 4/5/22, at 2-8 (headings & some footnotes omitted).

## I.    <u>PROCEDURAL HISTORY - PRESENT ACTION</u>

On October 18, 2018, Rubin filed a civil complaint against Stewart, HLM, and Alejandro for wrongful use of civil proceedings,[9] and requested "a judgment for the harm resulting from the interference with the advantageous use of his business suffered during the proceedings, attorney fees incurred in defending himself against the proceedings, emotional distress caused by the proceedings and punitive damages." *See* Rubin's Complaint, 10/18/18, at 6. Rubin averred, *inter alia*, that Stewart called him "a 'piece of shit' and threatened to put him in jail and to put him 'out of business.'" *Id.* He further asserted that Stewart "blackmail[ed him by] demanding $159,411.53, for a matter in which his client suffered no damages, to refrain from reporting [Rubin for] alleged ongoing criminal conduct." *Id.* Rubin was represented by his brother, Steven H. Rubin, Esquire (Brother).

_____

[9] Rubin also included a claim for abuse of process, which was abandoned at trial.

Stewart subsequently filed preliminary objections on behalf of himself and HLS, and separate preliminary objections on behalf of Alejandro, whom he continued to represent. The trial court overruled both sets of preliminary objections by orders docketed February 8, 2019.[10]  **See** Orders, 2/8/19.  On February 19th, Mitchell Ayes, Esquire, and Christopher G. Fusco, Esquire, entered their appearances on behalf of Stewart and HLS, and Christopher Del Bove, Esquire subsequently entered his appearance on August 5, 2019.  On October 8, 2019, Lane R. Jubb, Jr., Esquire, entered his appearance on behalf of Rubin.[11]  Stewart continued to represent Alejandro.

In November of 2019, Rubin filed a motion in *limine* in anticipation of the jury trial scheduled for January of 2020.  He noted the "clear conflict" in the case because Stewart was both the attorney representing Alejandro in the matter, and her co-defendant, represented by his own, separate counsel. Rubin requested the court "exclude . . . Stewart from making statements and/or argument to the jury on his own behalf" while advocating for Alejandro. **See** Rubin's Motion in Limine to Preclude Unfairly Prejudicial, Misleading, and Confusing Evidence and Argument from Stewart, 11/19/19, at 4-5.

On January 21, 2020, the parties appeared for a jury trial.  However, the trial court, *sua sponte*, addressed what it perceived to be a "clear and

_____

[10] Alejandro filed motion for reconsideration which the court denied on March 8, 2019.  **See** Order, 3/8/19.

[11] Louis Tumolo, Esquire, later entered as Rubin's co-counsel on February 11, 2021.

palpable conflict of interest," namely, Stewart's continued representation of Alejandro despite being named as her co-defendant. *See* N.T., 1/21/20, at 5. Although Alejandro informed the court that she waived any conflict and still desired to have Stewart represent her, the trial court determined the "blatant" conflict was so "profound" that it required the court to remove Stewart as her attorney. *See id.* at 19-22. Accordingly, the court continued the trial to allow Alejandro time to obtain a new attorney. *See* Order, 1/21/20. Stewart, on behalf of Alejandro, appealed from the order removing him as counsel, which this Court quashed as interlocutory. *See Rubin v. Stewart*, 771 EDA 2020 (Pa. Super. Apr. 13, 2021). Alejandro proceeded to represent herself *pro se* in the litigation.

On June 18, 2021, Stewart filed a motion in *limine* seeking to preclude certain evidence, as well as punitive damages. *See* Memorandum of Law in Support of [Stewart's] Motion in *Limine*, 6/18/21 at 1-2. The court ruled on Stewart's various claims before the start of the jury trial on July 14, 2021. *See* N.T., 7/14/21, at 12-18. On July 19th, the jury returned a verdict in favor of Rubin and against Stewart and Alejandro, concluding that they "procure[d], initate[d] or continue[d] the underlying action in a grossly negligent manner OR without probable cause [and] primarily for an improper purpose[.]" Verdict Slip, 7/19/21, at 1-2. The jury awarded the following damages: (1) $0 for harm to Rubin's reputation; (2) $480,000 for expenses "reasonably incurred in defense of the underlying action" including attorney's fees; and (3) $100,000 for emotional distress. *Id.* at 3. The jury attributed

the damages 50% each to Stewart (and HLS) and Alejandro. *Id.* at 2. Lastly, the jury awarded punitive damages against Stewart in the amount of $159,000, and against Alejandro in the amount of $5,399.99. *Id.* at 3-4.

On July 29, 2021, Stewart filed a timely motion for post-trial relief, as well as a request for consideration by the trial court sitting *en banc*; Alejandro subsequently filed a post-trial motion, *pro se*, on August 9th.[12] While those motions were pending, both Stewart and Alejandro filed notices of appeal from the jury verdict. *See* Dockets 1701 EDA 2021, 1874 EDA 2021.

Meanwhile, on October 18, 2021, Rubin filed two answers in opposition to the post-trial motions. On October 29th, Randall J. Henzes, Esquire, entered his appearance on behalf of Alejandro. An *en banc* hearing on the post-trial motions was conducted on November 3rd. That same day, Stewart filed a reply in further support of his post-trial motions. On November 22, 2021, the trial court entered an order denying both Stewart's and Alejandro's motions for post-trial relief. *See* Order, 11/22/21. The court also entered judgment on the verdict. Both Stewart and Alejandro filed timely appeals and complied with the trial court's directive to file Pa.R.A.P. 1925(b) statements of errors complained of on appeal. The trial court filed a joint opinion on April

---

[12] Pursuant Pa.R.C.P. 227.1(b), any party may file a post-trial motion within 10 days of the filing of the first post-trial motion. Although Alejandro filed her motion on the eleventh day, the tenth day following Stewart's filing was a Sunday. Therefore, she had until Monday, August 9th to file a post-trial motion. *See* 1 Pa.C.S. § 1908.

- 11 -

5, 2022.[13]  As noted above, Stewart's appeal is docketed at 2554 EDA 2021,

and Alejandro's appeal is docketed at 2555 EDA 2021.[14]  Stewart, once again,

represents Alejandro on appeal.

On January 22, 2022, this Court entered an order dismissing the prior

appeals, docketed at 1701 EDA 2021 (Alejandro) and 1874 EDA 2021

(Stewart), as duplicative of the appeals *sub judice*, which were "properly taken

from judgment entered following denial of post-trial motions."  Order,

1/28/22, at 2-3 (unpaginated).

## II.  ISSUES ON APPEAL

Stewart raises the following claims on appeal at Docket 2554 EDA 2021:

1) Did the [t]rial [c]ourt err as a matter of law and abuse its
   discretion when it failed to grant non-suit after [Rubin] failed

---

[13] The trial court's opinion does not address many of the issues raised on appeal.  Rather, the court noted that Stewart's post-trial motion failed to "state how the grounds were asserted in pre-trial proceedings or at trial."  **See** Trial Ct. Op., 4/5/22, at 9.  Although Stewart filed a supplemental motion to address the court's concern, the court determined that only three issues were preserved.  **See id.** at 10.  Upon our review, however, we conclude that most of Stewart's claims were preserved at trial and in his post-trial motion.

[14] We note that there are two additional appeals related to this case.  Following trial, Rubin's counsel filed a motion seeking sanctions against Stewart for an incident that occurred during a court recess on July 15, 2021.  Following briefing and two hearings, the trial court granted the motion and directed Stewart to pay $10,000 in sanctions.  Stewart filed a motion for reconsideration, which the trial court subsequently granted in part.  Stewart filed an appeal both from the court's order granting the motion for sanctions (411 EDA 2022), and the order granting, in part, his motion for reconsideration (1018 EDA 2022).

to prove [ ] Stewart . . . lacked probable cause to initiate and continue the underlying consumer protection action?

2) Did the [t]rial [c]ourt err as a matter of law and abuse its discretion when it failed to grant non-suit after [Rubin] failed to prove the elements of the Dragonetti Act?

3) Did the [t]rial [c]ourt err as a matter of law and abuse its discretion when [Rubin] failed to prove that . . . Stewart . . . acted in a grossly negligent manner?

4) Did the [t]rial [c]ourt err as a matter of law and abuse its discretion in admitting into evidence the following prejudicial documents: Judge Bartle's August 29, 2018 Memorandum and Order; references to the [Pennsylvania] Rules of Professional Conduct; all writings attempting to resolve the underlying litigation; [Brother's] attorney notes; and [Rubin's] attorneys' bills from the underlying matter[?]

5) Did the [t]rial [c]ourt err as a matter of law and abuse its discretion when it failed to grant remittitur based on the fact that [Rubin's] evidence supports no more than $41,000 in attorney's fees in the underlying action, not the jury award of $480,000?

6) Did the [t]rial [c]ourt err[ ] as a matter of law and abuse[ ] its discretion in permitting the jury to consider an award for punitive damages and then refuse[ ] to strike the award as being unconstitutional to attorneys[?]

Stewart's Brief at 4-5.

Alejandro presents the following two issues for our review at Docket

2555 EDA 2021:

1. Whether [Rubin] proved by a preponderance of the evidence that . . . Alejandro lacked probable cause to initiate and continue the underlying consumer protection action and can therefore be liable under the Dragonetti statute?

2. Whether the trial court erred in disqualifying *pro bono* trial counsel without notice or a hearing based upon a perceived by speculative conflict of interest when [Alejandro] waived such conflict in writing and in open court and when the trial court knew that disqualification of trial counsel would prejudice

- 13 -

> [Alejandro's] ability to defend herself thereby impairing her
> due process rights?

Alejandro's Brief at 6.[15]


## III.   DRAGONETTI ACT CLAIMS

Both Stewart and Alejandro challenge their respective liability under the Dragonetti Act, 42 Pa.C.S. §§ 8351-8355.  The Dragonetti Act codifies the tort of wrongful use of civil proceedings, which "arises when a party institutes a lawsuit with a malicious motive and lacking probable cause."  ***Werner v. Plater-Zyberk***, 799 A.2d 776, 785 (Pa. Super. 2002).  The Act provides as follows:

> A person who takes part in the procurement, initiation or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings:
>
> (1) he acts in a grossly negligent manner **or** without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and
>
> (2) the proceedings have terminated in favor of the person against whom they are brought.

42 Pa.C.S. § 8351(a)(1)-(2) (emphasis added).

The Act further defines that a person has probable cause under the following circumstances:

> [I]f he reasonably believes in the existence of the facts upon which the claim is based, and either:

---

[15] We have reordered Alejandro's claims for ease of disposition.

(1) reasonably believes that under those facts the claim may be valid under the existing or developing law;

(2) believes to this effect in reliance upon the advice of counsel, sought in good faith and given after full disclosure of all relevant facts within his knowledge and information; or

(3) believes as an attorney of record, in good faith that his procurement, initiation or continuation of a civil cause is not intended to merely harass or maliciously injure the opposite party.

42 Pa.C.S. § 8352(1)-(3). Although, "[u]sually, the existence of probable cause is a question of law for the court rather than a jury question, [it] may be submitted to the jury when facts material to the issue of probable cause are in controversy." **Broadwater v. Sentner**, 725 A.2d 779, 782 (Pa. Super. 1999) (emphasis & citation omitted).

Thus, in order to establish a Dragonetti action, the plaintiff must prove, by a preponderance of the evidence:

(1) the defendant has procured, initiated or continued the civil proceedings against him; (2) the proceedings were terminated in his favor; (3) the defendant did not have probable cause for his action; (4) the primary purpose for which the proceedings were brought was not that of securing the proper discovery, joinder of parties or adjudication of the claim on which the proceedings were based; and (5) the plaintiff has suffered damages. . . .

**Kit v. Mitchell**, 771 A.2d 814, 819 (Pa. Super. 2001), *citing* 42 Pa.C.S. § 8354. This Court has emphasized, however, that "the clear language of Section 8351 permits a cause of action to be based on gross negligence **or** lack of probable cause." **Keystone Freight Corp. v. Stricker**, 31 A.3d 967, 973 (Pa. Super. 2011) (citation & quotation marks omitted). "Gross

negligence is defined as the want of even scant care and the failure to exercise even that care which a careless person would use." *Id.*

With this background in mind, we proceed to address both Stewart's and Alejandro's Dragonetti Act claims.

### (1) Stewart's Dragonetti Act Claims

### (a) Compulsory Nonsuit Claim

Stewart challenges his liability under the Dragonetti Act in his first three issues on appeal. He contends the trial court erred and abused its discretion when it failed to grant a compulsory nonsuit following Rubin's case-in-chief. Stewart's Brief at 16. Stewart insists that Rubin failed to establish that Stewart lacked probable cause in initiating and continuing the underlying UTPCPL lawsuit, or, absent expert testimony, that he acted in a grossly negligent manner. *See id.* at 16-17. Rather, Stewart maintains "no two reasonable minds could disagree that the outcome should have been rendered in [his favor], in light of the Pennsylvania Supreme Court's recent decision in *Gregg v. Ameriprise Fin*[*ancial*]*, Inc.*, 245 A.3d 637 (Pa. 2021)." *Id.* at 19. Stewart is entitled to no relief.

Preliminarily, we address Rubin's contention that Stewart's first issue is waived because it is framed as a challenge to the trial court's denial of his motion for compulsory nonsuit. *See* Rubin's Brief (2554 EDA 2021) at 19. Rubin asserts: "Where, as here, the defendant elects to put on evidence after the trial judge denies a nonsuit, the nonsuit stage is over and the correctness

of that ruling is moot and cannot be reviewed." ***Id.***, *citing* ***F.W. Wise Gas Co. v. Beech Creek Railroad Co.***, 263 A.2d 313, 315 (Pa. 1970). Further, Rubin notes that Stewart did not challenge the denial of the nonsuit in his post-trial motions; rather, he argued he was entitled to judgment notwithstanding the verdict (JNOV). ***See*** Rubin's Brief (2554 EDA 2021) at 20-21. Accordingly, Rubin insists Stewart's first issue is waived.

It is well-established that after moving for a compulsory nonsuit, "[i]f the defendant elects to proceed, the non-suit stage is over and the correctness of the court's ruling is moot." ***Burns v. City of Philadelphia***, 504 A.2d 1321, 1325 (Pa. Super. 1986). Nevertheless, this Court has considered arguments in favor of a nonsuit when they are reasserted in support of a request for JNOV. ***See id.***; *see also* ***Northeast Fence & Iron Works, Inc. v. Murphy Quigley Co.***, 933 A.2d 664, 668 (Pa. Super. 2007).

Here, the arguments Stewart presents in his brief in support of his assertion the trial court improperly denied his request for a compulsory nonsuit are the same arguments he presented in his post-trial motions and Rule 1925(b) concise statement in support of his request for JNOV. Therefore, we decline to conclude his challenge to the Dragnonetti Act verdict is waived; instead, we review his argument as a claim that the trial court erred in denying JNOV.

### (b)   JNOV Standard

Our review of an order denying JNOV is well-established:

Our standard of review of an order denying [JNOV] is whether, reading the record in the light most favorable to the verdict winner and granting the benefit of every favorable inference, there is sufficient competent evidence to support the verdict. Any conflict in the evidence must be resolved in the verdict winner['s] favor. [JNOV] may be granted only in clear cases where the facts are such that no two reasonable minds could fail to agree that the verdict was improper.

*Bannar v. Miller*, 701 A.2d 242, 246 (Pa. Super. 1997) (citations omitted). Moreover, JNOV "may not be employed to invade the province of the jury[; t]hus, questions of fact must be resolved by the jury." *Ludmer v. Nerberg*, 640 A.2d 939, 942 (Pa. Super. 1994).

### (c)   Underlying Cause of Action

In the present case, Stewart does not challenge the first two elements of the Dragonetti claim — that is, he "initiated or continued" civil proceedings against Rubin, and those proceedings were terminated in Rubin's favor. *See* 42 Pa.C.S. § 8354. Rather, he insists Rubin failed to prove he acted either without probable cause, or in a grossly negligent manner.

Stewart maintains that he reasonably pursued a UTPCPL claim against Rubin under the "catch all" provision of the Act. *See* Stewart's Brief at 19-24. The UTPCPL provides, in relevant part:

Any person who **purchases or leases goods or services** primarily for personal, family or household purposes and thereby suffers **any ascertainable loss of money or property**, real or personal, **as a result of the use or employment by any person of a method, act or practice declared unlawful** by [Section 201-3] of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. . . .

73 P.S. § 201-9.2(a) (footnote omitted) (emphases added). Our Supreme Court has explained that "[t]he UTPCPL's private right of action is not a general-purpose enforcement provision[, and o]nly those who can meet the requirements of the UTPCPL's private cause of action may bring a personal action." *Grimes v. Enterprise Leasing Co. of Philadelphia, LLC*, 105 A.3d 1188, 1194 (Pa. 2014).

Section 201-3 declares "unlawful" the acts defined as "[u]nfair methods of competition" and "unfair or deceptive acts or practices" listed in Section 201.2. 73 P.S. § 201-3(a). In addition to 20 specific acts, Section 201-2 includes a catch-all provision, which defines a deceptive act as "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi). Stewart asserts that his UTPCPL claim against Rubin was grounded in the catch-all provision, as interpreted by the Supreme Court in *Gregg*.[16]

In *Gregg*, a couple sued their financial advisor and his employer (Ameriprise) after the advisor made material representations to them which induced them to purchase certain insurance policies. *See Gregg*, 245 A.3d at 640. They alleged common law claims for negligent and fraudulent

---

[16] Stewart's reliance on *Gregg* is perplexing as that decision was filed on February 17, 2021, nearly four years after Stewart initiated the UTPCPL lawsuit by writ of summons, and more than two and one-half years after he filed the third (and final) amended complaint. Nevertheless, he insists the *Gregg* Court relied "on the holding of [*Commonwealth v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010 (Pa. 2018)], which was the law at the time . . . Stewart analyzed . . . Alejandro's case." Stewart's Brief at 20.

misrepresentation, as well a violation of the UTPCPL's catch-all provision. *See id.* at 640-41. A jury returned a defense verdict on the common law claims, but the UTPCPL claim proceeded to a bench trial, and the trial court ruled in favor of the couple. *See id.* at 641. Ameriprise subsequently argued that, based upon the jury's defense verdict on the common law claims, the couple failed to establish that the advisor's "misrepresentations were, at the very least, negligent, a finding that Ameriprise asserted was required to establish deceptive conduct under the [UTPCPL]." *Id.* After the trial court, and this Court, rejected that claim, Ameriprise appealed to the Supreme Court.

The Supreme Court agreed with the decision of this Court that "a strict liability standard applies to [the couple's UTP]CPL claim." *Gregg*, 245 A.3d at 641.

> A plain language analysis of the relevant statutory provision leads inexorably to the conclusion that deceptive conduct under the [UTP]CPL is not dependent in any respect upon proof of the actor's state of mind. The Superior Court's holding is consistent not only with the plain language of the [UTP]CPL, but also with our precedent holding that the [UTP]CPL is a remedial statute that should be construed broadly in order to comport with the legislative will to eradicate unscrupulous business practices.

*Id.* *See also Golden Gate Nat'l Senior Care*, 194 A.3d at 1023 ("[N]either the intention to deceive nor actual deception must be proved; rather, it need only be shown that the acts and practices are **capable of being interpreted in a misleading way**.") (emphasis added). The *Gregg* Court explained that the UTPCPL verdict was based upon the trial court's determination that

> Ameriprise's representations to the [couple] "created a likelihood of confusion or misunderstanding" because [the advisor] "failed to

- 20 -

clearly and fully explain the cost and terms of the [life insurance] policy" [and a]s a result, the [couple] "reasonably believed" that they would not pay any additional money for the new life insurance policy.

*Id.* at 652 (record citation omitted).

Relying on **Gregg**, Stewart argues that Alejandro's claims were actionable under the catch-all provision which imposes strict liability on "commercial vendors who engage in conduct that has the potential to deceive and which creates a likelihood of confusion or misunderstanding." Stewart's Brief at 20 (citation omitted). Here, Stewart maintains: (1) Alejandro received "a consumer service" from Rubin's business, namely an eye examination; (2) Alejandro suffered a "loss of property" when she was not provided her prescription immediately following the examination; and (3) Alejandro was informed by Rubin's office manager that she had to pay for glasses before she would be given her prescription. *Id.* at 23. Stewart insists that the fact Rubin provided Alejandro with a "fake invalid prescription"[17] after

_____

[17] Stewart asserts that the prescription Rubin belatedly provided to Alejandro was "invalid" because Rubin admitted at trial that he — not a licensed optometrist — "authored and signed the prescription." Stewart's Brief at 22. *See also* N.T., 7/15/21, at 121 (acknowledging he "filled out all the information" on the optometrist's prescription pad and handed the prescription to Alejandro). Stewart claims that Alejandro never obtained a valid prescription, which pursuant to 49 Pa. Code § 23.72 must, *inter alia*, "bear the date it was issued by a licensed practitioner and contain an expiration date." Stewart's Brief at 33. *See* 49 Pa. Code § 23.72 (requiring an "[o]ptometric prescriptions" bear, *inter alia*, (1) the name, address and license number of optometrist; (2) patient's name; (3) date prescription was issued; and (4) expiration date). It bears emphasis, however, that it is undisputed Alejandro used that purportedly invalid prescription to obtain eyeglasses at another establishment.

he spoke with Stewart, does not spare him liability — Rubin engaged in a "deceptive and misleading act" when he and his employees "condition[ed] the issuance and release of [Alejandro's] prescription" on something other than her payment for an eye examination. *Id.* at 22-23, 24.

### (d) Dragonetti Act analysis

With this background in mind, we consider Stewart's primary claim that Rubin failed to demonstrate Stewart lacked probable cause to initiate and continue the underlying proceedings or that he acted in a grossly negligent manner. With regard to probable cause, Stewart argues that Rubin failed to present any evidence that he "did not reasonably believe . . . Alejandro's claim was anything but valid under existing or developing law." Stewart's Brief at 30. *See also* 42 Pa.C.S. § 8352(1). He emphasizes Rubin's "series of misrepresentations[,]" including that Rubin submitted a bill to Alejandro's insurance for the eye exam under the wrong location and wrong optometrist, that Alejandro was not provided with her prescription after the exam, and that Alejandro was required to purchase glasses before obtaining her prescription. Stewart's Brief at 30. Moreover, Stewart maintains that there was no evidence presented that his initiation and continuation of the underlying lawsuit was "intended to merely harass or maliciously injure" Rubin. *Id.* at 31. *See also* 42 Pa.C.S. § 8352(3). He insists that as an attorney, he is permitted to pursue a lawsuit he "believes is not going to prevail as long as he files it for the purpose of adjudicating the claim and not intended primarily for an improper

purpose." Stewart's Brief at 31. Here, Stewart emphasizes that while Rubin contends he filed the lawsuit in response to an insult made during their January 2017 telephone call, the record reveals Alejandro hired him before that insult and before Rubin "issued the fraudulent prescription." *See id.* at 32.

With regard to the assertion that he was grossly negligent, Stewart insists the claim fails because Rubin neglected to present expert testimony. Stewart's Brief at 34-35. Relying on federal case law, Steward contends that a Dragonetti action is similar to a legal malpractice action, and, therefore, expert testimony is required to establish the standard of care*. See* Stewart's Brief at 35.

The trial court rejected Stewart's claims, concluding there was sufficient evidence for the jury to conclude that Stewart initiated and continued the underlying action both without probable cause **and** in a grossly negligent manner. *See* Trial Ct. Op., 4/5/22, at 12-15.

Regarding the lack of probable cause, the court concluded "[t]here was ample evidence [Stewart] lacked 'good faith'" when he filed the underlying complaint based upon "known falsehoods." Trial Ct. Op., 4/5/22, at 14. Indeed, Stewart filed a suit "alleging that Rubin did not provide Alejandro with a copy of her prescription" when he knew that was untrue. *Id.* In fact, Stewart knew "the matter was resolved to Alejandro's satisfaction on January 17, 2017 when she was handed a copy of her eyeglass prescription[,]" which she later used "to purchase prescription glasses from another entity." *Id.* at

15. "Nevertheless, a complaint was drafted, and verified, knowingly containing false information." *Id.*

Moreover, the trial court observed that while Stewart "professed to be "well-versed'" in the UTPCPL, he filed a complaint based upon Rubin's failure to provide Alejandro with a copy of her prescription, which involved a medical service — exempt from the act — and for which Rubin, **an optician**, had no obligation to provide. *See* Trial Ct. Op., 4/5/22, at 14. Rather, the "eyeglass rule," upon which Stewart based Alejandro's entire complaint, provides, in relevant part:

> It is an unfair act or practice for **an ophthalmologist or optometrist** to:
>
> (a)  Fail to provide to the patient one copy of the patient's prescription immediately after the eye examination is completed. . . .

16 C.F.R. § 456.2(a) (emphasis added). As the trial court points out, Stewart "failed to offer any evidence that [Rubin] held himself out as either an ophthalmologist or optometrist." Trial Ct. Op., 4/5/22, at 14.

The trial court also found the jury's verdict could have been based upon a determination that Stewart was "grossly negligent." *See* Trial Ct. Op., 4/5/22, at 12-13. Contrary to Stewart's claim, the court concluded that no expert testimony concerning Stewart's actions in his capacity as Alejandro's attorney was required because "[t]he issues presented . . . were neither complex nor beyond the knowledge of the average person." *Id.* at 13. The court summarized:

Alejandro wanted a prescription for glasses; [Rubin] refused to give her a copy when she rejected delivery of glasses using said prescription. Alejandro contacted Stewart through HLS for assistance. Alejandro received a copy of her prescription within an hour after Stewart contacted [Rubin].

On the date that the Writ of Summons was filed, all parties knew that Alejandro had, as of January 17, 2017, a copy of her prescription — without charge — and was able to obtain prescription glasses. Nevertheless, [Stewart] alleged that [Rubin] was continuing to withhold the eyeglass prescription.

\* \* \*

[Furthermore,] Stewart, without Alejandro's consent or knowledge, submitted a demand to settle the matter based upon issues totally unrelated to the underlying cause of action. The suit, based upon false and inaccurate information, continued for almost 18 months before the state claims were dismissed and the federal claims withdrawn, with prejudice.

*Id.* Consequently, the trial court concluded that the evidence presented was sufficient to support the jury's determination that Stewart was liable to Rubin under the Dragonetti Act.

Upon our review of the record, we agree. Considering first the issue of probable cause, the evidence supports a finding that Stewart did not "reasonably believe[ ] in the existence of the facts upon which the claim [was] based[.]" *See* 42 Pa.C.S. § 8352(1). Indeed, Stewart himself acknowledged that at the time he notified Rubin of the claim on January 27, 2017, he knew that, 10 days earlier, Rubin had provided Alejandro with a copy of her prescription, at no charge, which she then used to obtain other glasses.[18] *See*

_____

[18] Moreover, both Rubin and Alejandro testified that they informed Stewart that Alejandro received a copy of her prescription before he filed the lawsuit. *(Footnote Continued Next Page)*

N.T., 7/19/21, at 57-58. Nevertheless, Stewart repeatedly asserted in each of the underlying complaints that he filed Alejandro's notice of claim on January 27th "[a]fter unsuccessful attempts . . . to . . . obtain [her] prescription" which Rubin "**still refused to provide**" unless Alejandro paid for eyeglass frames. **See** Alejandro's Third Amended Complaint, 5/2/18, at ¶¶ 37-38 (emphasis added). Thus, Stewart knew the factual basis supporting Alejandro's claim was false.

Furthermore, Stewart's new assertion — that the prescription Rubin provided to Alejandro was "fraudulent" and therefore Alejandro never had "a valid prescription" — is a red herring. **See** Stewart's Brief at 32-33. First, Stewart did not raise that claim in the underlying proceedings; thus, he cannot rely on it at this time to justify his prior actions. Second, Alejandro admitted that she used the prescription provided to her by Rubin to purchase eyeglasses at another establishment. Thus, Stewart's present claim that Alejandro was never provide a "valid" prescription is simply false.

Moreover, there was also sufficient evidence for the jury to conclude Stewart did not "reasonably believe[ ]" Alejandro had a valid claim under existing or developing law. **See** 42 Pa.C.S. § 8352(1). As explained **supra**, a private action under the UTPCPL may be filed only if a person "purchases or

---

**See** N.T., 7/14/21, at 122-23 (Alejandro admitting Stewart knew she had the prescription before he filed the lawsuit); 144 (Rubin stating he informed Stewart that he had already given Alejandro's her prescription after receiving Stewart's notice of claim).

leases goods or services" and "suffers any ascertainable loss or money or property" as a result of the defendant's "use or employment" of an unlawful practice as defined in the Act. 73 Pa.C.S. § 201-9.2(a). Here, although Alejandro purchased a "service" — *i.e.*, her eye examination — it is well-established that "the UTPCPL does not apply to providers of **medical** services." ***See Walter v. Magee-Womens Hosp. of UPMC Health Sys.***, 876 A.2d 400, 407 (Pa. Super. 2005) (emphasis added), *aff'd per curiam*, 906 A.2d 1194 (Pa. 2006). Therefore, the failure to provide Alejandro with her prescription immediately following her medical examination is not actionable under the UTPCPL. Moreover, Stewart failed to present any evidence that Alejandro suffered an "ascertainable loss of money or property" as a result of the purportedly deceptive act. ***See*** 73 Pa.C.S. § 201-9.2(a). Alejandro received a copy of her prescription at no cost, and was not required to pay for the glasses that she ordered, but later refused to purchase. Accordingly, contrary to Stewart's assertion, ***Gregg*** provides no basis for relief, as that case did not involve medical services, and the plaintiffs clearly suffered an "ascertainable loss of money" by having to pay "additional money for the new life insurance policy." ***See id.***; ***Gregg***, 245 A.3d at 652.

Lastly, the evidence presented at trial was sufficient for the jury to conclude that Stewart, as Alejandro's attorney, did not, in good faith, believe the action was initiated and continued for a purpose other than merely to harass or maliciously injure Rubin. ***See*** 42 Pa.C.S. § 8352(3). Rubin testified that he insulted Stewart during their January 17, 2017, a claim which Stewart

denied.  *See* N.T., 7/15/21, at 128, 135; N.T., 7/19/21, at 37.  However, despite the fact that Alejandro testified she **only** wanted a copy of her prescription, and that she received that copy on January 17, 2017, Stewart proceeded to send Rubin a notice of claim 10 days later, and, on February 21, 2017, a demand for $25,000 to settle all claims against him.  *See* Stewart Exhibit 5 (Email from Stewart to Rubin, 2/21/17).  Stewart then proceeded to make repeated settlement demands, several without Alejandro's knowledge or consent, and without any monies directed to her alleged damages.

Accordingly, we agree with the determination of the trial court that there was sufficient evidence in the record to support the jury's verdict — namely, that Stewart initiated and continued Alejandro's action without probable cause.  *See Bannar*, 701 A.2d at 246.  Because we conclude the verdict was proper under the no probable cause prong, we need not address whether Stewart acted with gross negligence.  *See Keystone Freight Corp.*, 31 A.3d at 973 ("Section 8351 permits a cause of action to be based on gross negligence **or** lack of probable cause") (citations & quotation marks omitted).  Nevertheless, we agree with the trial court's determination that expert testimony is not required to prove an attorney's liability in a Dragonetti action, particularly where, as here, the issues were "neither complex nor beyond the knowledge of the average person."  *See* Trial Ct. Op., 4/5/22, at 13.  *See also Miller v. St. Luke's Univ. Health Network*, 142 A.3d 884, 896-97 (Pa. Super. 2016).  Thus, Stewart's first three issues, challenging the jury's verdict on Dragonetti claim, warrant no relief.

### (2)   Alejandro's Dragonetti Act Claim

In her only challenge to the jury's verdict, Alejandro, represented by her co-defendant Stewart,[19] argues that Rubin failed to prove she "lacked probable cause to bring the underlying consumer protection action in order to hold her liable under the Dragonetti Act." Alejandro's Brief at 22.   First, she contends the question of whether she had probable cause to initiate and continue the underlying action should have been determined by the trial court, and not submitted to the jury. *Id.* at 24.  Second, Alejandro insists that Rubin failed to establish she lacked probable cause or acted with gross negligence in bringing the underlying action, or that she did so "for any improper purpose." *Id.* at 25.  Rather, Alejandro asserts that as Stewart's client, she was entitled to rely upon his legal advice, so long as she provided all the relevant facts necessary to litigate her claim. *See id.* at 27.   She contends that she "had probable cause once she gave attorney . . . Stewart full disclosure of all relevant facts and sought his advice in good faith." *Id.* at 31-32.  Like Stewart, Alejandro relies upon *Gregg*, *supra*, as support for her underlying UTPCPL allegations. *See* Alejandro's Brief at 34-35.

_____

[19] This Court has held that an attorney, who is disqualified from representing a client at trial, is not permitted to represent that same client on appeal as to any claim, except to challenge the disqualification order. *See E.R. v. J.N.B.*, 129 A.3d 521 (Pa. Super. 2015).  Thus, it is clearly improper for Stewart to represent Alejandro in her appeal challenging the jury's verdict regarding the Dragonetti claim.  Nevertheless, as this Court concluded in *E.R.*, we decline to punish Alejandro for Stewart's actions, and thus, we will address her Dragonetti claim on appeal.

- 29 -

Alejandro is entitled to no relief. As we noted *supra*, while the existence of probable cause in a Dragonetti action is generally a question of law for the court, it "may be submitted to the jury when facts material to the issue of probable cause are in controversy." *Broadwater*, 725 A.2d at 782 (emphasis & citation omitted). Here, although Alejandro claims "the undisputed facts" demonstrate she "sought advice in good faith regarding a potential" legal issue, she provides no support for her bald allegation. *See* Alejandro's Brief at 24.

Rather, our review of the record reveals Alejandro **never** testified that she relied, in good faith, on Stewart's legal advice before agreeing to institute the UTPCPL lawsuit. *See* 42 Pa.C.S. § 8352(2) (a person has probable cause if she "reasonably believes in the existence of the facts upon which the claim is based, and . . . believes to this effect in reliance upon the advice of counsel, sought in good faith and given after full disclosure of all relevant facts"). In fact, she testified that when she contacted Stewart, she "just wanted [her] prescription. That's all [she] needed." N.T., 7/14/21, at 114. Although Alejandro agreed that "[b]efore suing [ ] Rubin [she] relied on the advice of counsel[,]" she provided no details as to the advice she received, or why she agreed to institute the lawsuit after she received what she wanted — her prescription. *See id.* at 127. Moreover, she conceded that she rejected Rubin's $5,000 settlement offer, "[e]ven though [she] had no intentions of initially suing" him. *Id.* at 123. Alejandro did not elaborate as to why she believed any of her claims had legal merit. In fact, she later testified that she

was "not sure what [her] eyes have to do with money." *Id.* at 132. Furthermore, the jury was permitted to infer that Alejandro, at the very least, continued the proceedings for an improper purpose when she rejected Rubin's settlement offer, despite her admission that she suffered no damages. *See* 42 Pa.C.S. § 8351(a)(1). Accordingly, we conclude the evidence was sufficient for the jury to find that Alejandro had no probable cause to initiate and continue the underlying action.

We also emphasize, as Rubin points out in his brief, that Alejandro provides no argument rebutting Rubin's alternative claim that she acted in a "grossly negligent" manner. *See* Rubin's Brief (2555 EDA 2021) at 32. Indeed, the question presented on the jury's verdict slip read as follows:

> Did [ ] Alejandro procure, initiate, or continue the underlying action in a grossly negligent matter **OR** without probable cause?

Verdict Slip at 1 (emphasis added). As noted above, "the clear language of Section 8351 permits a cause of action to be based on gross negligence **or** lack of probable cause." *Keystone Freight Corp.*, 31 A.3d at 973 (citation & quotation marks omitted; emphasis added). Thus, the jury could have concluded Alejandro acted in a grossly negligent manner — a finding she does not challenge on appeal — and we could affirm on that basis as well. Consequently, Alejandro's first claim fails.

## IV.   STEWART'S REMAINING ISSUES (2554 EDA 2021)

### (1)   <u>Admission of Evidence</u>

Next, Stewart challenges the trial court's rulings admitting certain evidence.  "Questions concerning the admission or the exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent a clear abuse of discretion."  ***Ludmer***, 640 A.2d at 944.

> An abuse of discretion is not merely an error of judgment[ but, rather, is] the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will[,] or partiality, as shown by the evidence of record.  If in reaching a conclusion the trial court overrides or misapplies the law, discretion is then abused[,] and it is the duty of the appellate court to correct the error.

***El-Gharbaoui v. Ajayi***, 260 A.3d 944, 964 (Pa. Super. 2021) (citation omitted).

Stewart contends the trial court abused its discretion when it admitted the following evidence:  (1) Judge Bartle's August 29, 2018, memorandum disposing of the underlying federal lawsuit; (2) references to the Pennsylvania Rules of Professional Conduct; (3) Stewart's "compromise offer" and settlement negotiations; (4) Brother's testimony as a fact witness; and (5) Rubin's legal invoices.  We address these claims seriatim.

### (a)   Judge Bartle's Memorandum

Stewart insists the trial court's ruling permitting "references to Judge Bartle's August 29, 2018, Memorandum" was improper for several reasons. Stewart's Brief at 37.  First, he maintains "the Memorandum was confusing

and prejudicial to the extent it formed the basis of liability" against him. *Id.* He also argues the admission of the decision violated Fed.R.Civ.P. 56(e) (summary judgment) and Pa.R.C.P. 4014(d) (request for admission). *Id.* Stewart contends that although Judge Bartle treated the motion as "unopposed," Rubin argued to the jury that Judge Bartle found the facts were "undisputed." *See id.* at 41. Lastly, Stewart asserts the memorandum was either inadmissible hearsay, or admissible hearsay but "prejudicial and improperly offered as evidence that [he] lacked probable cause for the underlying action" because he was not a party to the underlying action. *Id.* at 38. *See also id.* at 45 (arguing Judge Bartle's memorandum does not "bind" him because he was not a party in the underlying action).

We conclude no relief is warranted. Our Supreme Court has explained that a judicial opinion is admissible if it is relevant, it is "not inadmissible hearsay[,]" and it is "probative and not unfairly prejudicial." *Castellani v. Scranton Times, L.P.*, 124 A.3d 1229, 1240 (Pa. 2015). Here, Judge Bartle's opinion was relevant to establish that the underlying proceedings terminated in Rubin's favor, and that Stewart lacked probable cause to initate and continue those proceedings. *See* 42 Pa.C.S. § 8351(a)(1)-(2). Stewart argued that Judge Bartle ruled in Rubin's favor merely because the motion was unopposed, *i.e.*, because he failed to file a response to the motion for summary judgment. *See* N.T., 7/19/21, at 114-15. However, Judge Bartle opined that Alejandro's claims "fail[ed] for many reasons[,]" including the fact that she proffered no evidence to support her allegation that the UTPCPL

applied to the services provided by Rubin. *See* N.T., 7/14/21, at 164-65. Moreover, contrary to Stewart's characterizations, Rubin did not argue that the "admissions" in Judge Bartle's memorandum were "undisputed." *See* Stewart's Brief at 41. The only mention of facts being "undisputed" was in Judge Bartle's memorandum, in which he set forth the facts underlying Alejandro's claims — none of which Stewart or Alejandro dispute in the present case. *See* Stewart's Motion for Post Trial Relief, 6/29/21, at Exhibit B, Judge Bartle's Memorandum, 8/29/18, at 3-4.

Stewart's assertion that the admission of the memorandum violated Fed.R.Civ.P. 56(e) and Pa.R.C.P. 4014(d) is specious. First, the federal rules of civil procedure do not apply in state court. Moreover, the federal rule upon which Stewart relies is inapplicable here. Fed.R.Civ.P. 56, which applies to motions for summary judgment, provides, in relevant part:

> **(e) Failing to Properly Support or Address a Fact.** If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court **may**:
>
> > **(1)** give an opportunity to properly support or address the fact;
> >
> > **(2)** consider the fact undisputed for purposes of the motion;
> >
> > **(3)** grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it; or
> >
> > **(4)** issue any other appropriate order.

Fed.R.Civ.P. 56(e)(1)-(4) (emphasis added). The Rule simply permits a federal court to consider an unopposed fact to be undisputed. It does not mandate that the court must do so.

Similarly, Pa.R.C.P. 4014(d) is inapplicable as it pertains to pretrial discovery requests for admissions. *See* Pa.R.C.P. 4014(a) ("A party may serve upon any other party a written request for the admission, for purposes of the pending action only[.]"), (d) ("Any admission by a party **under this rule** is for the purpose of the pending action only and is not an admission by the party for any other purpose nor may it be used against the party in any other proceeding.") (emphasis added). Judge Bartle's memorandum was not a "request for admission" admitted under Rule 4014. Thus, Rule 4014 has no application here.

Lastly, to the extent Stewart argues the memorandum was inadmissible hearsay, and, in any event, not binding on him because he was not a party in that action, we conclude both of these arguments are waived. Indeed, Stewart did not raise either of these assertions in his pretrial motion *in limine* seeking to preclude admission of Judge Bartle's memorandum, nor when Rubin referenced the memorandum during trial. *See* Memorandum of Law in Support of [Stewart's] Motion *in Limine* at 13-15; N.T., 7/14/21, at 157-65. Accordingly, Stewart's first evidentiary challenge warrants no relief. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

### (b) Pennsylvania Rules of Professional Conduct

Stewart also contends the court abused its discretion when it permitted "references to alleged violations of the Pennsylvania Rules of Professional Conduct . . . to form the basis of [Rubin's] case-in-chief on liability and damages." Stewart's Brief at 45-46. He insists that a violation of the Rules does not "have any relevance to the elements of a Dragonetti claim[,]" nor does it provide a basis "for civil liability or damages[.]" *Id.* at 47, 49.

The trial court determined that "[a]ny objections to use of the Rules of Professional Conduct were waived." Trial Ct. Op., 4/5/22, at 15. The court explained:

> Questions of the witness's familiarity with the Rules of Professional Conduct ("Rules") began on the second day of trial[, July 15, 2021.] During that testimony, Stewart and HLS objected nine (9) times. The first . . . objection[ was] to citation; [however, when Rubin's counsel offered to publish the document to which he was referring,] Stewart and HLS did not object to publication. The second objection was to the form of a question. The third was towards the relevance of a question related [to] fee agreements as did the fourth. In response, Stewart said, "I think it would be helpful if I answered a question."
>
> During question[ing], and based upon Stewart's responses, counsel for [Rubin] reproduced a copy of the Rules found at www.padisciplinaryboard.org. Stewart and HLS lodged a fifth objection claiming that the "documents" were never exchanged before trial.
>
> The sixth objection was as to relevance of any [questions] about "any potential conflict of interest or any conflicts of interest." The seventh objection went to the form of the question as did the eighth. The ninth, and final objection, in this course of questioning was to relevance about [whether an attorney is acting in his client's] legitimate interest [when he realizes a financial gain from] improperly delaying litigation.

On July 16, 2021, the [Rubin] moved, into evidence, the Rules referenced during Stewart's testimony. Stewart and HLS objected to P-301 (Google search of the Rules).

Stewart returned to the stand on July 19, 2021 with the Pennsylvania Rules of Court, "including the Pennsylvania Rules of Professional Conduct. It's the volume from 2008 that I had on my desk." It was not until [after all parties'] rested when Stewart and HLS first objected to the use of the [Rules] in [Rubin's] case in chief.

*Id.* at 15-16 (footnotes omitted).

"It is axiomatic that in order to preserve a trial objection for review, trial counsel is required to make a timely, specific objection during trial."

***Takes v. Metro. Edison Co.***, 695 A.2d 397, 400 (Pa. 1997) (citation omitted).

Requiring issues to be properly raised first in the trial court ensures that trial judges have the opportunity to consider a potential appellate issue and correct any error at the first available opportunity. It also promotes the orderly and efficient use of judicial resources, ensures fundamental fairness to the parties, and accounts for the expense attendant to appellate litigation.

***Trigg v. Children's Hosp. of Pittsburgh of UPMC***, 229 A.3d 260, 269 (Pa. 2020) (citations omitted).

Our review of the record reveals the trial court properly concluded Stewart waived any objection to Rubin's reference to the Rules of Professional Conduct by failing to make a timely and specific objection on that basis when Rubin questioned him about his knowledge of the Rules. ***See*** N.T., 7/15/21, at 84-114; N.T., 7/16/21, at 22-24. Accordingly, his present claim fails.

### (c)     Compromise Offer & Settlement Negotiations

Next, Stewart argues the trial court abused its discretion when it admitted into evidence an April 5, 2018, email Stewart, as Alejandro's counsel, sent to Rubin in response to Rubin's $5,000 settlement offer.  ***See*** Stewart's Brief at 49.  The email rejected that offer and countered with a request for $159,411.53, which included $33,000 in state and federal "statutory penalt[ies,]" $100,000 in punitive damages, and $26,411.53 in attorneys' fees. ***See*** Memorandum of Law in Support of [Stewart's] Motion in *Limine* at Exhibit K, Email from Stewart to Brother, 4/5/18 (April 5th email).  Stewart maintains the email should have been precluded pursuant to Pa.R.E. 408 (compromise offers and negotiations), or, alternatively, the jury should have been instructed that the email "should not have been considered as proof of punitive, emotional or any other type of damage[.]"  Stewart's Brief at 49-50.  Further, he asserts "the email should have been excluded based upon the concept of judicial immunity."  ***Id.*** at 52.

Pennsylvania Rule of Evidence 408, which pertains to compromise offers and negotiations, provides, in relevant part:

> **(a) Prohibited Uses.**  Evidence of the following is not admissible — on behalf of any party — either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>
> (1) furnishing, promising, or offering — or accepting, promising to accept, or offering to accept — a valuable consideration in compromising or attempting to compromise the claim; and
>
> (2) conduct or a statement made during compromise negotiations about the claim.

**(b) Exceptions.** The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Pa.R.E. 408(a)(1)-(2), (b).

In the present case, Rubin contends the April 5th email was **not** admitted for one of the purposes prohibited under Rule 408(a). *See* Rubin's Brief (2554 EDA 2021) at 49. Rather, he maintains that the email was admissible under Rule 408(b) for another purpose — that is, as evidence that "the action was brought and prosecuted with gross negligence and for an improper purpose and with a reckless disregard for [his] interests." *Id.* at 48. We agree.

Rubin's Dragonetti action focused on Stewart's unreasonable demands and outrageous allegations. The April 5th email was at the heart of his grievances. In his complaint, Rubin alleged that after Stewart threatened to "put [him] in jail and to put [him] out of business" for billing errors, "Stewart sent an e-mail to [Rubin's] attorney with a demand for $159,411.53 and a threat to report [Rubin's] alleged ongoing criminal conduct to a tribunal unless the matter was concluded." Rubin's Complaint at 3. He also relied upon the threats and "blackmail" in the April 5th email to support his request for punitive damages. *See id.* at 6 (averring Stewart "committed the crime of blackmail by demanding $159,411.53, for a matter in which his client suffered no damages, to refrain from reporting alleged ongoing criminal conduct").

Accordingly, we agree that the April 5th email was admissible pursuant to Rule 408(b) for a purpose other than those prohibited under subsection (a).

Rubin did not seek to admit the April 5th email to "prove or disprove the validity" of Alejandro's underlying UTPCPL claims, or the amount of Alejandro's claim. *See* Pa.R.E. 408(a). Rather, he sought to admit the unreasonable demands and outrageous allegations of criminal conduct detailed in the email to support his claim that Stewart acted with gross negligence and for an improper purpose. Furthermore, contrary to Stewart's argument, the other purposes for which compromise or settlement offers may be admissible are not limited to those "three exceptions" stated in Rule 408(b). *See* Stewart's Brief at 51. Rather, the Rule prefaces the three stated exceptions with the phrase "such as," which connotates that other exceptions are permissible. *See* Pa.R.E. 408(b).

With regard to Stewart's assertion that the trial court should have instructed the jury that the email could not be considered as proof of any type of damages,[20] we find this claim waived because Stewart did not request this instruction from the trial court, nor did he object to the court's charge on damages before the jury began deliberations. *See* Pa.R.A.P. 302(b) ("A general exception to the charge to the jury will not preserve an issue for appeal. Specific exception shall be taken to the language or omission complained of."). Although Stewart did argue in his motion in *limine* that the email should be **excluded** as proof of damages because there was no evidence the email was "communicated to [Rubin] directly[,]" he did not

---

[20] *See* Stewart's Brief at 49-50.

request a specific jury charge to the effect. *See* Memorandum of Law in Support of [Stewart's] Motion *in Limine* at 18-19. Moreover, in his brief, Stewart provides no support statutory authority or caselaw for his assertion that "the email should have been excluded as proof of punitive, emotional or any other type of damage." *See* Stewart's Brief at 53. Thus, we reject this claim as waived and undeveloped.

Lastly, Stewart's reliance on the concept of "judicial immunity" is specious. "It has long been established that statements contained in pleadings, as well as statements made in the actual trial or argument of a case, are privileged." *Post v. Mendel*, 507 A.2d 351, 353 (Pa. 1986). The email at issue herein, however, was an **extra-judicial** communication between the attorneys representing both parties. An extra-judicial communication is not protected by judicial immunity unless it was "issued in the regular course of judicial proceedings as a communication pertinent and material to the redress sought." *Post*, 507 A.2d at 355-56. We cannot conclude the email at issue herein meets this standard. Accordingly, we agree that the trial court did not abuse its discretion in determining the email was admissible in the present case.

### (d) Brother's Testimony as Fact Witness

Stewart's penultimate evidentiary challenge is to the court's ruling permitting Brother, who previously served as Rubin's attorney in this matter, to testify as a fact witness at trial. Stewart's Brief at 54. He argues Brother's

testimony "confused and prejudiced the jury into believing [he] was an expert" witness. *Id.* Moreover, Stewart emphasizes that during rebuttal, Rubin was permitted to refer to Brother's "attorney notes" to support his allegation that Stewart called him a "piece of shit" during his deposition, an insult that was not transcribed. *See id.* 55-56. Stewart insists that the use of these notes constituted "trial by ambush and violates the spirit of the discovery rules" because the notes would have been "clearly protected during the pendency of the . . . matter." *Id.* at 54, 56.

First, we note that Brother was never presented as an expert witness to the jury, nor did Rubin argue that Brother's testimony should be considered as such. Rather, when Stewart objected to Brother's testimony at trial, the trial court ruled that Brother "can be questioned as to facts[,]" but would not be "allowed to provide expert testimony." *See* N.T., 7/14/21, at 141-42. In fact, Rubin's attorney confirmed that he was not offering Brother as an expert witness. *See id.* at 142. Brother's subsequent testimony focused on his interactions with Stewart, as Alejandro's attorney, in the underlying UTPCPL action. Stewart provides no support for his allegation that the jury believed Brother was an expert witness.

Stewart also provides no support for his assertion that Brother should not have been permitted to refer to his attorney notes during rebuttal testimony.

> "[T]he admission or rejection of rebuttal evidence is within the sound discretion of the trial judge." Moreover, our Supreme Court

has stated that "[r]ebuttal is proper where facts discrediting the proponent[']s witnesses have been offered."

***Mitchell v. Gravely Int'l, Inc.***, 698 A.2d 618, 620 (Pa. Super. 1997) (citations omitted).

Here, during his direct examination, Brother testified that Stewart "threatened" Rubin and "called him a piece of shit" during Rubin's deposition. ***See*** N.T., 7/14/21, at 180. During cross-examination, Stewart questioned Brother concerning whether he "thought to memorialize or put that insult in writing[.]" N.T., 7/15/21, at 19. Brother responded:

> I don't recall off the top of my head, the dates, but in pleadings filed with the Court or motions I did address the fact that [ ] Stewart called [ ] Rubin a piece of shit during the deposition.

***Id.*** However, he conceded he did not request the court reporter to put that statement on the record. ***Id.*** at 20.

After Stewart denied making such a statement at Rubin's deposition, and commenting that he "would have expected" Rubin's attorney to put "anything negative [that] had occurred on the record,"[21] Rubin called Brother as a rebuttal witness. Brother testified that after Stewart's testimony, he searched through his documents to see if there was any reference to the insult. ***See*** N.T., 7/19/21, at 147. At that time, he found notes he had taken during the deposition in which he recorded that Stewart said "[q]uote, for being a piece of shit, end quote." ***See id.*** at 150. Although Stewart objected on the basis that he had not had the opportunity to review the attorney notes,

---

[21] ***See*** N.T., 7/16/21, at 93-94.

and that they were privileged, the court permitted Rubin to publish the notes to the jury over Stewart's objection. *See id.* at 147-50.

Stewart fails to establish the trial court abused its discretion in permitting the rebuttal evidence. Although Stewart knew Brother alleged in court pleadings that Stewart made the insult at the deposition, he did not request any evidence supporting that claim as part of discovery. Further, he provides no support for his present assertion that any such evidence would have been privileged, and non-discoverable. Brother testified as to his belated discovery of his notes from the deposition. Thus, the decision to admit the rebuttal testimony and evidence was within the court's discretion. *See Mitchell*, 698 A.2d at 620.

### (e) Legal Invoices

Lastly, Stewart argues the trial court abused its discretion when it permitted Rubin to introduce into evidence legal invoices he received in connection with the underlying case. Stewart's Brief at 57-58. Stewart maintains the invoices constituted "inadmissible unauthenticated hearsay[,]" were not accompanied by testimony that fees charged were "reasonable and customary[,]" and included "references to legal fees generated during" the Dragonetti matter. *Id.* at 58.

The trial court found this claim waived. Trial Ct. Op., 4/5/22, at 11-12. We agree. During his direct examination, Rubin testified regarding the legal expenses he incurred during the underlying matter, and how he had to apply

for a loan to pay those expenses. *See* N.T., 7/15/21, at 161-64. Upon redirect, he was asked to identify legal invoices he received from Brother, as well as another attorney that had represented him at one time. *See* N.T., 7/15/21, at 209-11. Stewart lodged no objection to Brother's invoices, but initially objected to the other attorney's invoices as "hearsay," asserting they were not authenticated. *See id.* at 210-11. After Rubin's attorney explained that the documents were cross-marked as "Defense Exhibit 34," Stewart's counsel withdrew his objection. *See id.* at 211-12. It was not until the next day — after Rubin rested his case-in-chief and his attorney moved the invoices into evidence — that Stewart objected to the invoices as not authenticated. *See* N.T., 7/16/21 at 24. Because this objection was untimely, Stewart's present claim is waived. *See Takes*, 695 A.2d at 400.

### (2)   Remittitur

Stewart next argues the jury's award of $480,000 in expenses "incurred in defending the underlying action" is not supported by the evidence, which established, at most, $41,000 in reasonable attorney's fees. *See* Stewart's Brief at 60-62. Because "[t]he record is devoid of any additional expenses incurred by" Rubin, Stewart insists the trial court "must reduce the verdict to the amount actually incurred." *Id.* at 60.

In addition, Stewart argues the record does not support the jury's award of $100,000 for emotional distress because Rubin failed to "establish a factual nexus of causation . . . arising from the underlying pleadings, discovery,

joinder of parties or any impermissible civil process." Stewart's Brief at 62-63. He asserts that "[j]udicial immunity would preclude something that transpired during the underlying lawsuit from forming the basis of emotional distress[.]" *Id.* at 64. Stewart again complains that the April 5th email could not have caused Rubin's emotional distress because it was not sent to Rubin directly and "Pennsylvania law requires personal presence of the alleged victim of conduct which cased infliction of emotional distress[.]" *Id.*, *citing **Taylor v. Albert Einstein Medical Center***, 754 A.2d 650 (Pa. 2000).

When reviewing a trial court's denial of a remittitur, we must bear in mind the following:

> [J]udicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant. The question is whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption. Furthermore, [t]he decision to grant or deny remittitur is within the sole discretion of the trial court, and proper appellate review dictates this Court reverse such an Order only if the trial court abused its discretion or committed an error of law in evaluating a party's request for remittitur.

***Tong-Summerford v. Abington Mem'l Hosp.***, 190 A.3d 631, 650 (Pa. Super. 2018) (citations omitted).

Rubin suggests Stewart's challenge to the jury's award of $480,000 for "pecuniary losses other than attorney's fees" is waived because Stewart did not object to the court's instructions, which permitted the jury to award such

damages, nor did he request that the expenses awarded be limited to attorney's fees. Rubin's Brief (2554 EDA 2021) at 64-65. We agree.

The trial court's jury instruction on damages included the following:

[Rubin] is entitled to be fairly and adequately compensated for all harm he suffered as a result of [Stewart's and Alejandro's] conduct. The amount you award today must compensate [him] completely for damages sustained in the part and in the future, if any . . .

\* \* \*

The injuries for which you may compensate [Rubin] by an award of damages against [Stewart and Alejandro] include the expenses, including lawyer fees, incurred in the successful defense of the charges in the underlying case; the harm to [Rubin's] reputation that you find resulted from [Stewart's and Alejandro's] conduct; the pecuniary, or financial, losses, if any, suffered that you find resulted from [Stewart's and Alejandro's] conduct; and lastly, the emotional distress, mental anguish, and humiliation that you find [Rubin] suffered as a result of [Stewart's and Alejandro's] conduct.

N.T., 7/19/21, at 221-22. We note that this was the instruction **requested** by Stewart. **See** Proposed Points for Charge for [Stewart], 7/8/21, at 46.

Therefore, the jury was instructed that an award for expenses incurred in defending the underlying action was **not** limited to attorney's fees. Rather, the jury was permitted to award any "pecuniary, or financial, losses" it determined Rubin suffered as a result of Stewart's and Alejandro's conduct. **See** N.T., 7/19/21, at 222. Rubin testified that he became "obsessed" with and "consum[ed]" by the lawsuit, spending "hours and hours" attempting to find a solution, and he "[c]ouldn't focus" at work. N.T., 7/15/21, at 167. He stated that the lawsuit "affected [his] whole staff because he was "constantly

unavailable" and began working only "20 hours a week." *Id.* at 169-70. Although he acknowledged on cross-examination that he did not "claim any loss of revenue," he was positive he did lose revenue by "not being there" because he is the "one that generates the income for the practice." *Id.* at 172. Thus, there was testimony for the jury to determine that the expenses Rubin incurred as a result of the underlying lawsuit was much more than simply the attorney's fees. Stewart could have objected to the court's instruction or requested the court charge the jury that those damages were limited to reasonable attorney's fees. Because he did not, his challenge to this part of the jury's award is waived. *See* Pa.R.A.P. 302(b).

We also reject Stewart's challenge to the $100,000 award for emotional distress. The Dragonetti Act permits a plaintiff to recover damages for, *inter alia*, "[a]ny emotional distress that is caused by the proceedings." 42 Pa.C.S. § 8353(5). Furthermore, medical testimony is not a prerequisite for an award of emotional distress damages in a Dragonetti Act. *See Bannar*, 701 A.2d at 251. This Court has explained:

> A jury can reach a fair and competent determination of compensatory damages in the absence of medical testimony, based on evidence adduced at trial, even where the injury to the plaintiff is intangible.

*Id. See also Brown v. Halpern*, 202 A.3d 687, 711 (Pa. Super. 2019) ("Because emotional distress was not the tort he pursued, but was only the basis for which he sought damages[ in Dragonetti action, plaintiff] was not

required to offer medical evidence or third-party testimony regarding that emotional distress.").

When considering the appropriateness of a damages award, we view the evidence in the light most favorable to the verdict winner, here, Rubin. **See** **Brown**, 202 A.3d at 711. Rubin testified that he was "obsessed" with and consum[ed]" by the underlying action, so much so that "it took away [his] ability to . . . focus on [his] life." N.T., 7/15/21, at 167. He explained that he was "afraid to be at work" because he feared an "unhappy customer . . . was going to sue" him. **Id.** at 168. Rubin testified he "couldn't sleep at night" and "would wake up in the morning in a panic." **Id.** He was so terrified of Stewart — whom he described as an "absolute crazy person" — that, after his deposition, he installed security cameras at his house. **Id.** Rubin also stated that his obsession with the lawsuit had a "huge impact on [his] marriage[,]" and caused "a lot of tension[.]" **Id.** at 167. Moreover, Brother testified regarding the changes he observed in Rubin as a result of the UTPCPL pending lawsuit:

> [M]y perception of . . . Rubin is he was always a strong, confident person. Dealing with . . . Stewart and this lawsuit was causing him to deteriorate in front of me.
>
> . . . Rubin woke up every day thinking about this ridiculous lawsuit until he went to sleep at night. It invaded his life to such an extreme level that when we spoke about the matter, it affected his every waking moment.

N.T., 7/14/21, at 183. Thus, there was ample testimony for the jury to award Rubin damages for emotional distress.

Moreover, Stewart's reliance on *Taylor*, *supra*, is misplaced, as that case involved a claim of intentional infliction of emotional distress **not** wrongful use of civil proceedings.  Moreover, the *Taylor* Court considered whether a third person (in that case a mother) may recover for intentional infliction of emotional distress, when that third person is not present at the time an intentional tort is inflicted upon a third party (a child).  *See Taylor*, 754 A.2d at 651.  The Supreme Court held that the third party's "presence" was required in order to recover for intentional infliction of emotional distress. *See id.* at 653.  Thus, neither the facts in *Taylor*, nor issue it addresses, has any application here.

Lastly, we reject Stewart's renewed "judicial immunity" claim and corresponding assertion that Rubin could not have suffered emotional distress as a result of the April 5th email because it was not sent directly to him.  As we explained *supra*, the email was an **extra-judicial** communication between the attorneys representing both parties, and was not issued in the regular course of judicial proceedings.  *See Post*, 507 A.2d at 355-56.  With regard to Rubin's knowledge of the email, Brother testified that he "shared" the April 5th email he received from Stewart with Rubin.  *See* N.T., 7/14/21, at 173.  More importantly, Rubin never claimed his emotional distress was caused **solely** by the outrageous demands and allegations in the April 5th email.  Thus, Stewart's challenge to the court's denial of a remittitur fails.

### (3) **Punitive Damages**

In his final issue, Stewart contends the trial court erred and abused its discretion in permitting the jury to assess punitive damages against him when "only the Pennsylvania Supreme Court and the Disciplinary Board[ ] can administer 'punishment' to attorneys." Stewart's Brief at 65. While he recognizes the Dragonetti Act authorizes punitive damages, Stewart insists that "the concept of punitive damages against attorneys conflicts with the sanctions provisions of [Pa.R.C.P.] 1023.4(a)(1) . . ., as promulgated by the [Supreme] Court which regulates lawyers' conduct and the Pennsylvania Constitution." *Id.* at 66. He emphasizes that pursuant to Article V, Section 10(c) of the Pennsylvania Constitution, "[o]nly the Supreme Court of Pennsylvania, and natural extensions thereto, may promulgate rules of practice including the right to punish attorneys." *Id.* at 66-67.

Stewart further argues that "this is not an appropriate case for punitive damages" because the record "does not support [Rubin's] allegations that [Stewart's] conduct was malicious, willful, wanton, or oppressive[,]" or that he "exhibited reckless indifference to the rights of" Rubin. Stewart's Brief at 68. Moreover, Stewart argues that Rubin failed to present any evidence of "wealth," which Stewart contends the jury must consider before awarding punitive damages. *See id.* at 71.

Section 8353 of the Dragonetti Act specifically provides for an award of "[p]unitive damages according to law in appropriate cases." 42 Pa.C.S. §

8353(6). In determining whether a punitive damages award is appropriate, we must bear in mind:

> Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. Punitive damages must be based on conduct which is malicious, wanton, reckless, willful, or oppressive . . . .
>
> Further, one must look to the act itself together with all the circumstances including the motive of the wrongdoers and the relations between the parties . . . .

***Feld v. Merriam***, 485 A.2d 742, 747–48 (Pa. 1984) (citations omitted).

Here, Stewart first argues that an award of punitive damages against an attorney usurps the Pennsylvania Supreme Court's **sole** authority to regulate and sanction attorney conduct provided in the Pennsylvania Constitution. **See** Pa. Const. art. V, § 10(c) ("The Supreme Court shall have the power to prescribe general rules . . . for admission to the bar and to practice law, and the administration of all courts and supervision of all officers of the Judicial Branch[.]"). He also insists a punitive damages award conflicts with the sanctions provisions in Pennsylvania Rule of Civil Procedure 1023.4, which authorizes a trial court to sanction an attorney for a violation of Rule 1023.1. Rule 1023.1 provides, in relevant part:

> (c) The signature of an attorney . . . constitutes a certificate that the signatory has read the pleading, motion, or other paper. By signing, filing, submitting, or later advocating such a document, the attorney . . . certifies that, to the best of that person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances,

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation,

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification or reversal of existing law or the establishment of new law,

(3) the factual allegations have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual allegations are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

(d) If, after notice and a reasonable opportunity to respond, the court determines that subdivision (c) has been violated, the court may, subject to the conditions stated in Rules 1023.2 through 1023.4, impose an appropriate sanction upon any attorneys, law firms and parties that have violated subdivision (c) or are responsible for the violation.

Pa.R.C.P. 1023.1(c)(1)-(4), (d).

Stewart contends that the sanction provisions in the Pennsylvania Rules of Civil Procedure, which were promulgated by the Supreme Court, are the only permissible sanctions that may be imposed against an attorney. *See* Stewart's Brief at 66-67. He highlights the Pennsylvania Supreme Court's decision in ***Villani v. Seibert***, 159 A.3d 478 (Pa. 2017).

In that case, the Court considered whether the Dragonetti Act "infringe[d] upon [the] Court's [own] constitutionally prescribed power to regulate the practice of law[.]" ***Villani***, 159 A.3d at 479. The Court concluded it did not, and refused to "*per se* immunize attorneys, as attorneys, from the application of the substantive tort principles promulgated by the political

- 53 -

branch in the Dragonetti Act." *Id.* at 492-93 (footnote omitted). However, although the Court noted that the defendant had not directly challenged the "punitive damages aspect" of a Dragonetti claim as it relates to attorneys, it observed that, in a future case,

> there may be an argument to be made that punitive damages awards should not be available against attorney-defendants in Dragonetti cases, given that this Court has specifically provided for sanctions to deter violations. *See* Pa.R.C.P. No. 1023.4(a)(1). And it may also be that, in an appropriate case, the Court might invoke Article V, Section 10(c) — in a fashion more restrained than according blanket immunization to lawyers from the effects of a substantive-law statute — to construe Dragonetti Act liability as unwarranted in instances in which a claim was pursued based on a good faith argument that the existing law should be changed.

*Id.* at 491-92. Thus, Stewart implies that the case *sub judice* presents this Court with the opportunity to make such a ruling.

We reject Stewart's claim for the following reasons. First, the Note to Rule 1023.1 explicitly states:

> The following provisions of the Judicial Code, 42 Pa.C.S., **provide additional relief from dilatory or frivolous proceedings**: (1) Section 2503 relating to the right of participants to receive counsel fees and (2) **Section 8351** et seq. relating to wrongful use of civil proceedings.

Pa.R.C.P. No. 1023.1, Note (emphases added). Therefore, Rule 1023.1 was not intended to be the only avenue available for a litigant to obtain relief from frivolous proceedings. Moreover, as Rubin emphasizes in his brief, a Rule 1023.1 sanctions hearing "is more narrow and brief" than a Dragonetti action. *See* Rubin's Brief (2554 EDA 2021) at 77. Indeed, Rule 1023.1 refers only to frivolous or unfounded claims in "pleadings, motions, or other paper[s,]"

which have been signed, filed, submitted or advocated by an attorney; whereas a Dragonetti action encompasses all of the improper and negligent actions taken by the attorney in the "procurement, initiation or continuation of civil proceedings." *See* 42 Pa.C.S. § 8351(a); Pa.R.C.P. 1023.1(c). Accordingly, we conclude that an award of punitive damages under the Dragonetti Act does not conflict with the sanctions provision of Rule 1023.1(c), nor does it usurp the Supreme Court's authority to regulate the practice of law. For this reason, Stewart's constitutional challenge to the punitive damages award fails.

We also disagree with Stewart's assertion that "this is not an appropriate case for punitive damages." *See* Stewart's Brief at 68. Preliminarily, we note that "[t]he determination of whether a person's actions arise to outrageous conduct lies within the sound discretion of the fact-finder and will not be disturbed by an appellate court so long as that discretion has not been abused." *J.J. DeLuca Co. v. Toll Naval Assocs.*, 56 A.3d 402, 416 (Pa. Super. 2012) (citation omitted). Here, the evidence presented was certainly sufficient for the jury to conclude that punitive damages were warranted based on Stewart's outrageous settlement demands — absent any relation to damages suffered by his client — unwarranted threats of criminal prosecution, and dogged pursuit of claims with no basis in fact. The facts presented support the jury's determination that Stewart's conduct was "malicious, wanton, reckless, willful, or oppressive." *See Feld*, 485 A.2d at 747-48 (citation omitted).

Stewart's final contention, that the jury could not have assessed punitive damages without evidence of his wealth, is similarly meritless. "In assessing punitive damages, the trier of fact **may consider** the character of the tortfeasor's act, the nature and the extent of his victim's harm and the wealth of the tortfeasor." **Kirkbride v. Lisbon Contractors, Inc.**, 555 A.2d 800, 802 (Pa. 1989) (emphasis added). However, this Court has rejected the position "that wealth is a necessary prerequisite" to an award of punitive damages. **Vance v. 46 & 2, Inc.**, 920 A.2d 202, 207 (Pa. Super. 2007).

> [T]he polestar for the jury's assessment of punitive damages is the outrageous conduct of the defendants, not evidence of a defendant's wealth. Further, evidence of wealth is **not mandatory** to establish a claim for punitive damages. Therefore, [a] jury [can base] its award of punitive damages entirely on its assessment of [the defendant's] conduct.

**Reading Radio, Inc. v. Fink**, 833 A.2d 199, 215 (Pa. Super. 2003) (citations omitted & emphasis added). Thus, the fact that Rubin did not "seek a judicial order for wealth discovery" prior to trial or introduce evidence of Stewart's wealth, does not undermine the jury's punitive damages award. **See** Stewart's Brief at 72. Thus, Stewart's final claim fails.

### V. ALEJANDRO'S REMAINING ISSUE (2555 EDA 2021)

In her second issue on appeal, Alejandro argues the trial court violated her "due process rights and right to counsel of her choice when it disqualified Attorney [ ] Stewart . . . on the morning of trial[.]" Alejandro's Brief at 35.

By way of background, we note that Stewart was Alejandro's attorney of record from the inception of the Dragonetti action. As noted above, in anticipation of the first scheduled trial date of January 21, 2020, Rubin filed a motion in *limine*, seeking to preclude Stewart from arguing on his own behalf at trial, while purportedly advocating for Alejandro. ***See*** Rubin's Motion in Limine at 4-5. When the parties appeared for trial on January 21, 2020, the court did not specifically refer to Rubin's outstanding motion, but nevertheless, addressed "what seems to be a clear and palpable conflict of interest with counsel representing [ ] Alejandro." N.T., 1/21/20, at 5. Stewart — as Alejandro's attorney — responded to the court's concern by stating he did not believe his continued representation violated the Rules of Professional Conduct. ***See id.*** at 5-6. He argued that he did not intend to call himself as a witness on Alejandro's behalf, and he was not representing himself (as her co-defendant) in the litigation. ***Id.*** at 6-7. Furthermore, Stewart emphasized that Alejandro did not file any cross-claims against him, which she "could have . . . if she wanted to[.]" ***Id.*** at 9. He conceded that if she had, it would "certainly suggest[ ] a conflict of interest[.]"[22] ***Id.*** Stewart further stated he explained the potential conflict to Alejandro and she "waived what she thinks is a potential conflict of interest." ***Id.*** at 8-9. Moreover, he argued that before removing counsel, the court should consider the "impact and prejudice

---

[22] Interestingly, Stewart failed to note whether he **advised** Alejandro to assert cross-claims against him in this matter which would have clearly resulted in a direct conflict.

on the defendant, who would now be on the eve of trial, forced to get new cunseld or possibly counsel that she can't find, can't get ready or maybe cannot afford." *Id.* at 9-10.

Stewart reluctantly admitted, however, that "[t]here clearly are some practical staging issues[,]" such as how he, as Alejandro's counsel, could cross-examine himself as a witness at trial. N.T., 1/21/20, at 14. He suggested he could have other counsel "delve into that information." *Id.* at 16. The trial court then asked Alejandro if she understood the conflict of interest and was still willing to proceed with Stewart as her attorney, to which she simply replied, "Yes." *Id.* at 18-20.

Nevertheless, the trial court was unwilling to overlook the "palpable and blatant" conflict of interest in the present case. N.T., 1/21/20, at 21. The court explained:

> The reason [the Rules of Professional Conduct] don't actually say with exactitude . . . that a lawyer who represent[ed] a defendant can't then testify as a co-defendant is because I think no one even thought that would be a possibility. That's how palpable and blatant the conflict is. Even though it may not seem so, even though there's a way of arguing around it now, this isn't what we plan on doing, this isn't what we foresee the defense is, just by virtue of the simple fact [Stewart is] going to be testifying and [Alejandro] wouldn't have anyone to cross-examine her in her best interest shows you how blatant this conflict is. One of the powers that I do have is to prophylactically prevent a conflict that would exist. Understanding there's a waiver on her part is significant, but this is about as profound a conflict as you can have, co-defendants where one co-defendant is an attorney representing the other co-defendant.

*Id.* at 21-22. The trial court subsequently entered an order removing Stewart as counsel for Alejandro and continued the case for 60 days so that she could "retain different counsel." Order, 1/21/20.[23] As noted previously, Alejandro proceeded to trial *pro se*.

On appeal, Alejandro insists that the relevant Pennsylvania Rules of Professional Conduct permit an attorney to represent a client, "notwithstanding a concurrent conflict of interest," if, *inter alia*, the attorney "reasonably believes" he can provide "competent and diligent representation[,]" the representation does not involve a claim by one client against another in a litigation in which both are represented by the attorney, and any affected client provides "informed consent." Alejandro's Brief at 36, *citing* Pa.R.P.C. 1.7(b). Alejandro maintains that Stewart possessed the requisite "reasonable belief" in the present case, and she provided her consent to the potential conflict in open court "in an on-the-record colloquy." Alejandro's Brief at 36-37.

Alejandro further argues that an attorney should not be disqualified where such disqualification "would work substantial hardship on the client." Alejandro's Brief at 37, *citing* Pa.R.P.C. 3.7(a)(3). She insists that there was

---

[23] The trial judge who presided over the January 21st proceeding, the Honorable Michael E. Erdos, did not preside over the July 2021 trial. As noted above, Alejandro filed an interlocutory appeal from the court's January 21, 2020, order, which this Court later quashed. **See supra** at 9-10. In response to that prior appeal, Judge Erdos filed an opinion in support of his ruling, which we will refer to as the relevant trial court opinion concerning this issue. **See** Trial Ct. Op., 6/30/20.

substantial hardship in the present case because she, "an indigent mother of three with below-poverty-level income who subsists primarily on welfare, [was] forced to defend herself in a million-dollar lawsuit as a *pro se* litigant." Alejandro's Brief at 38. Further she maintains there were other remedies available to ensure that **Rubin** — whom she claims sought the disqualification — received a fair trial. *Id.* at 45-46. Indeed, Rubin himself sought only to limit Stewart's "in-court presentation." *Id.* at 48. Lastly, she contends the trial court erred in disqualifying her attorney without conducting a hearing. *See id.* at 50.

"When reviewing a trial court's order on disqualification of counsel, we employ a plenary standard of review." *Darrow v. PPL Elec. Utilities Corp.*, 266 A.3d 1105, 1111 (Pa. Super. 2021) (citation omitted). A trial court may disqualify an attorney if it determines the attorney violated ethical rules. *Id.* (citation omitted). Nevertheless,

> courts should not lightly interfere with the right to counsel of one's choice. Thus, disqualification is appropriate only when both another remedy for the violation is not available and it is essential to ensure that the party seeking disqualification receives the fair trial that due process requires.

*Id.* (citation omitted).

The trial court provided the following explanation for its decision to remove Stewart as Alejandro's counsel:

> Because Stewart and [ ] Alejandro present to the Court as co-defendants in this case, Stewart's removal as counsel was necessary, not as a sanction, but to protect [ ] Alejandro's right to a fair trial, untainted by Stewart's inherently biased advice.

- 60 -

In the same vein, the Rules of Professional Conduct prohibit representation where a concurrent client conflict exists. Pa.R.P.C. 1.7. A personal interest of the lawyer can be a source of a concurrent conflict of interest. *Id.* The Comments to Rule 1.7 explain further:

> The lawyer's own interests should not be permitted to have an adverse effect on representation of a client. For example, **if the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice.**

Pa.R.P.C. 1.7 Explanatory Comment 10.

The instant matter is, indeed, about the probity of Stewart's conduct in the underlying case, and of [ ] Alejandro's own. Rubin sued Stewart and [ ] Alejandro separately for Wrongful Use of Civil Proceedings and Abuse of Process. . . .

\* \* \*

Each defendant could choose to give evidence against the other in defense of himself or herself. The Court does not believe that Stewart could give detached advice as to what evidence [ ] Alejandro could present in her defense when some of that evidence might be adverse to his own defense. Nor does the Court think he should be put in a situation where he would have to do that in order to competently represent her. The Rules protect clients from incompetent representation, and they protect attorneys from the problematic choice between providing competent representation and protecting their own interests by defending a claim against oneself.

Though Stewart has maintained that he recognizes and can honor the distinction between his representation of [ ] Alejandro and his attorney's representation of himself, *see* Pa. R.P.C. 1.7 . . . in practice he has already proven himself unable to do so. The defense attorneys in this case, including Mr. Del Bove and Stewart, have at times and in the same hearing, made arguments on behalf of each other's clients. N.T. 7/24/19 10:21-11:10 (Mr. Del Bove arguing on behalf of Ms. Alejandro); N.T. 7/24/19 34:19-37:16, 48:17-49:9 (Stewart arguing on behalf of himself); N.T. 9/11/19 17:15-18:11 (Stewart arguing on behalf of himself in the third person); N .T. 9/11/19 49:3-50:6 (Mr. Del Bove arguing on behalf of Ms. Alejandro). Similarly, since withdrawing from his

own case, he has argued on his own behalf in his Motion for Summary Judgment ostensibly filed on behalf of [ ]Alejandro. Any wall that Stewart argues has been put up to keep the representations of himself and [ ] Alejandro separate and guard against a conflict is made of paper.

Stewart cannot reasonably believe he can competently advise [ ] Alejandro when there is the potential that some of the decisions they would have to make would require a choice between an option that is better for Stewart or one that is worse for him. For example, at the January hearing, Stewart said there might be a conflict if [ ] Alejandro had filed a cross-claim against him, but that she hadn't. N.T. 1/21/20 9:2-9:7. That Stewart has not filed a cross-claim against himself on behalf of [ ] Alejandro comes as no surprise to the Court. Even the potential that [ ] Alejandro might want to file a cross-claim against her attorney creates an actual conflict of interest. An attorney cannot be expected to advise his client about the availability or merits of a cross-claim against himself — this is precisely the kind of decision the Rule against personal interest conflicts protects an attorney from having to contemplate.

Moreover, it is also against the Rules for an attorney to take a case in which they are "likely to be a necessary witness." Pa. R.P.C. 3.7(a). Stewart is a named Defendant in this case, so it is foreseeable that he would be called as a witness, and [Rubin's] counsel stated his intention to call him. N.T. 1/21/2014:15-17.

In addition, there is a practical problem that will arise when Stewart testifies. At the January hearing, the Court asked Stewart who would cross-examine him on behalf of [ ] Alejandro if he were called to the stand, and he responded, "I don't know. Your Honor." N.T. 1/21/20 14:21-22. The Court would be doing a disservice both to [ ] Alejandro and to the jury by allowing Stewart to present testimony in defense of himself, while at the same time attempting to maintain his professional duties to his client.

Trial Ct. Op., 6/30/20, at 4-7 (emphasis added).

The trial court provided a thorough and well-reasoned basis for its ruling, and we see no need to elaborate further. Stewart's representation of Alejandro — in a case in which he is her co-defendant and the claims are based

upon his representation of her in a prior action — is, as the trial court observed, "about as profound a conflict as you can have[.]" **See** N.T., 1/21/20, at 22. Moreover, the court acted within its discretion in finding Alejandro's purported waiver of the conflict to be uninformed and insufficient, and Stewart's belief that he could represent Alejandro despite the conflict, unreasonable.

Briefly, with regard to Alejandro's specific complaints, we first emphasize that the trial court appeared to address the conflict issue *sua sponte*, and not in response to Rubin's motion in *limine* as Alejandro now contends. **See** N.T., 1/21/20, at 5; Alejandro's Brief 45-46. Moreover, Alejandro's remaining claims are waived. Because she failed to request a hearing in the trial court, she waived her contention that the court failed to conduct an evidentiary hearing. **See** Pa.R.A.P. 302(a); Alejandro's Brief at 50. Moreover, we conclude the January 21, 2020, proceeding sufficiently protected her due process rights. Alejandro also waived any argument concerning the purported "substantial hardship" she suffered upon Stewart's disqualification as her counsel. **See** Alejandro's Brief at 37-38. Indeed, the only argument regarding hardship before the trial court was Stewart's general statement that the court should consider the "impact and prejudice" Alejandro may suffer if forced to obtain new counsel that "she can't find, can't get ready or maybe cannot afford." N.T., 1/21/20, at 9-10. Alejandro did not provide any testimony regarding the "hardship" she now claims on appeal. Lastly, Alejandro waived her claim that there were other, less drastic, remedies

available, when, again, she did not make that argument in the trial court. ***See***

Alejandro's Brief at 45-46. Accordingly, Alejandro's second issue fails.

## VI. CONCLUSION

Therefore, we conclude the none of the claims raised by Stewart or Alejandro on appeal warrant relief, and we affirm the judgment entered against both co-defendants.

Judgment affirmed against Stewart and HLS at Docket 2554 EDA 2021.

Judgment affirmed against Alejandro at Docket 2555 EDA 2021.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/15/2023